# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MANJINA PATEL, as the Guardian of
KISHAN PATEL, an incapacitated person,

                        Plaintiff,

    vs.

THE CITY OF NEW YORK, POLICE
OFFICER HIEU TRAN, MAYOR ERIC
ADAMS, COMM. EDWARD CABAN, and
POLICE OFFICERS JOHN DOE 1-10

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMAPLAINT

## PRELIMINARY STATEMENT

1.      On May 17, 2024, thirty-year-old Kishan Patel was shot in the head by Officer Hieu Tran, a "ticking timebomb" employed by The New York City Police Department ("NYPD"). Although Mr. Patel miraculously survived this random and preventable act of violence, he will require 24/7 skilled nursing care for the rest of his life as he is now a quadriplegic who has also suffered an anoxic brain injury.

2.      Defendant City of New York knew that Tran had significant mental health challenges with longstanding alcoholism, despite his being only twenty-seven years old. Somehow, he was accepted into the NYPD and armed with a service pistol, but soon became a "problem officer" who needed to be taken "off the street." After serving in Harlem for less than three years, Officer Tran was transferred to the office of the Deputy Commissioner of Public Information ("DCPI"). This is a well-known repository for NYPD employees who have committed acts of misconduct but, for some reason, are not removed from the NYPD altogether.

Most officers who are sent to DCPI have already accumulated many years of experience. Officer Tran's assignment to this office is highly unusual because of his notable lack of experience.

3.  Notably, Officer Tran was *not suspended* from the force and was *not required to surrender his 9mm service pistol*. That is the same weapon that he used to shoot Kishan Patel.

4.  The shooting took place in southern New Jersey, not far from Philadelphia. After leaving Patel to bleed uncontrollably in the cab of his pickup truck, Officer Tran calmly drove north, stopped for gas, went home to New York, reloaded his weapon and went to work the next day like nothing had happened. Officer Tran was also found to have been conducting internet searches to learn about the shooting.

5.  Local police in New Jersey were able to reassemble Officer Tran's movements from numerous video sources, including sources which show the actual incident. The three 9mm shell casings found at the scene matched Officer Tran's service weapon. Officer Tran was arrested at his workplace at the Office of Public Information, charged with attempted murder and other offenses, and has been in custody in Camden County, New Jersey, ever since.

6.  At a pre-trial detention hearing, Judge Michael Joyce of the New Jersey Superior Court denied bail after reviewing the state's evidence. Part of that evidence was a psychological evaluation that Officer Tran was on a downward spiral. The following excerpts from the transcript of that hearing show the implications of what was in the psychological report, and the fact that Officer Tran's NYPD superiors knew of these issues:

            Now what we have here, according to Dr.
Wiltzy, is a young police officer suffering from
untreated work related PTSD, depressive disorder and a
long history of substance abuse, specifically, Judge,
he's been self medicating with alcohol for years.  Dr.
Wiltz offers the opinion that these conditions were a
direct contributing factor to this unfortunate event.
Dr. Wiltzy also --
            THE COURT:  His commanding officer in New
York PD told him to get treatment for it and didn't do
it.
            MR. GIGLIOTTI:  Excuse me?
            THE COURT:  His commanding officer, New York
PD recognized he had an alcoholic abuse problem, told
him to get treatment for it, hasn't done it.
            MR. GIGLIOTTI:  And he didn't.  Understood.


            Dr. Wiltzy further indicates, Judge, that he
believes Officer Tran was on a downward spiral.


            Defense counsel noted that the treating -- or
evaluating psychologist, rather, Dr. Wiltzy, indicate
that he's on a downward spiral.  That's located on page
nine of the report.  Going down the following sentence
the doctor goes on the opine that, "It seems inevitable
that something tragic was impending in his life based
upon his physical, psychological and emotional
deterioration."
            So if I read this correctly, the doctor's
essentially opining that his was almost inevitable that
this defendant was going to do something awful.
Nothing about this report says that it was limited to a
one time thing, as I read it, Your Honor.

*See*, pages 22-24 of June 25, 2024, Detention Hearing Transcript, a copy of which is attached

hereto as Exhibit "A" to this Complaint.

        7.    The failure of the Defendant City of New York ("City") and the New York City

Police Department ("NYPD") to adopt and/or enforce adequate policies, procedures, and

practices to address a longstanding problem of alcohol and substance abuse by its police

officers, while both on-duty and off-duty, constituted deliberate indifference and was a proximate cause of Plaintiffs' injuries.

8.      The City's and NYPD's negligence and deliberate indifference to adequately respond to alcohol abuse and mental health challenges of its police officers includes longstanding notice of the problem and a failure to adopt and/or enforce policies, procedures and practices addressing the use and misuse of police issued service weapons by officers both on-duty and off-duty who are not fit for duty because of said abuse and mental health challenges while in possession of their firearms.

9.      Defendants Police Officers John Doe 1-10 were responsible for the recruitment, training, supervision, retention and discipline of New York City Police Officers, including Defendant Officer Tran. At all relevant times these Defendants were negligent and deliberately indifferent to the rights of Plaintiff Kishan Patel, which negligence caused the Plaintiff to suffer catastrophic injuries as further described herein.

10.     As a remedy for these violations alleged therein, Plaintiff seeks compensatory damages, punitive damages and an award of the costs and expenses of this action including attorneys' fees to the Plaintiffs pursuant to 42 U.S.C. §1988; and any such other and further relief as this Court may deem appropriate.


## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1343. Plaintiffs further invoke the supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

12.     Venue in the Southern District of New York is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this action occurred within the district.


## TRIAL BY JURY

13.     Plaintiff demands a trial by jury on each and every one of their claims herein.


## PARTIES

14.     At all relevant times, **Plaintiff Kishan Patel** was a resident of Voorhees, New Jersey.

15.     At all relevant times, **Plaintiff Manjina Patel** was a resident of Voorhees, New Jersey. Plaintiff Manjina Patel is the mother of Kishan Patel and has been designated by the Surrogate of New Jersey, as the legal and natural guardian of Kishan Patel, an incapacitated person.

16.      **Defendant City of New York** is a duly constituted municipal corporation of the State of New York. It is authorized under the laws of the State of New York to maintain a police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

17.      **Defendant Officer Hieu Tran** was at all times relevant herein a police officer employed by the City and the NYPD and was a resident of Westchester County. At all times

relevant to the facts of this Complaint, said Defendant was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacity.

18.    **Defendant Mayor Eric Adams** ("Mayor Adams") was at all times relevant herein the Mayor of New York City and had the final say as policymaker for the hiring of the Police Commissioner and the policies, customs and practices that were in effect at the time of the events giving rise to this lawsuit. At all relevant times to the facts of this Complaint, Mayor Adams was acting under color of law and within the scope of his employment as the Mayor of New York City. Said Defendant is sued in his individual and official capacity.

19.    **Defendant Commissioner Edward Caban** ("Comm. Caban") was at all times relevant herein the New York City Police Commissioner and the police department's final policymaker. At all times relevant to the facts of the Complaint, Comm. Caban was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacity.

20.    **Defendant Police Officer John Does 1-10**, whose names are not presently known to Plaintiffs, were at all times relevant herein the Police Officer John Does 1-10 were` responsible for conducting the training and supervision of Officer Hieu Tran during his short career as an NYPD officer. At all relevant times to the facts of the Complaint, said Defendants were acting under color of law and within the scope of their employment by the City. Said Defendants are sued in their individual and official capacities.

21.    The conduct and injuries complained herein were inflicted on the Plaintiffs by the Defendants without any negligent or culpable conduct by the Plaintiffs.

## OPERATIVE FACTS

22.     On May 17, 2024, Kishan Patel finished working at the liquor store he managed and co-owned with his parents, got into his yellow 2023 Dodge Ram pickup truck, and drove to his home in Voorhees New Jersey.

23.     At approximately 11:00 PM on that date, Mr. Patel was alone in his vehicle, driving northbound on Route 73 in Voorhees Township. He was just minutes from his home. As he approached Route 73's intersection with Cooper Road, there was a red light for traffic travelling in his direction. At that intersection, Route 73 northbound has two lanes of through traffic crossing Cooper Road. Mr. Patel's pickup truck was stopped in the left lane, first in line, at the red light.

24.     While Mr. Patel's pickup truck was waiting for the light to turn green, a white SUV being driven by Officer Hieu Tran pulled up next to Mr. Patel's vehicle.

25.     According to police observations of surveillance footage which showed the two cars at the intersection, they were only stopped next to each other for a moment. The video then shows the pickup truck speeding uncontrollably through the intersection before the light turns green and striking at least one other vehicle. The video also shows the white SUV going through the intersection before the light turned green and speeding up the road.

26.     Shortly after 11:00 PM Voorhees Township police officers responded to a reported motor vehicle collision. When they arrived at the scene of the incident, they found Kishan Patel still in the pickup truck. Police noted an "inordinate amount of blood" inside the vehicle and bullet strikes on the pickup truck.

27.     Mr. Patel was in the driver's seat, unconscious and unresponsive. Emergency medical personnel noted uncontrolled bleed from a gunshot wound. They initiated chest

compressions in an effort to save Mr. Patel's life. He was loaded into an ambulance, intubated, and taken to Cooper Trauma Center.

28.     At the hospital, Mr. Patel was diagnosed with multiple injuries stemming from both the gunshot wound and the motor vehicle crash that followed right after. Most significantly, Mr. Patel suffered an anoxic brain injury and a spinal cord injury. He has required round-the-clock medical care ever since.

29.     Although Officer Tran fled the scene, Voorhees Township police were able to piece together the events which occurred immediately before and after the shooting.

30.     Officer Tran had attended a wedding earlier that evening in Sicklerville, New Jersey, which is south of Voorhees, where the shooting took place.

31.     At the time of the shooting, Mr. Tran was employed by the NYPD and living in Yonkers, New York. To attend the wedding, he drove himself from his home to southern New Jersey.

32.     The Administrative Guide ("AG") for the NYPD requires that officers be fit for duty _at all times_ and that they not consume alcoholic beverages or take any other action that would prohibit them from operating their service weapon in a safe and reasonable manner. That same guide requires officers to be armed at all times that they are traveling within New York City, including when they are travelling to and from the city. _See_, AG 304-03, 304-04, 305-07, and 318-10.

33.     On the date of the shooting, Officer Tran was known to have suffered from alcoholism and other mental health challenges that should have disqualified him from being an armed and active member of the NYPD. At the aforementioned detention hearing in Camden County, New Jersey, it was disclosed that Officer Tran had been "advised" to seek help for his

alcoholism, but that he had not done so. Despite this failure, he continued to be armed and employed by the NYPD.

34.    There was no prior connection between Officer Tran and Mr. Patel. By all accounts, this appears to have been a completely random act of violence.

35.    As shown in surveillance video, the white SUV being operated by Officer Tran sped away from the scene of the shooting, leaving Mr. Patel to die. Voorhees police were able to track Officer Tran's white SUV to a nearby Wawa gas station where he calmly filled up his car and continued north to New York.

36.    Based on the myriad of surveillance videos reviewed by police, it is clear that no one was in the car with Officer Tran at any time either before or after the incident.

37.    Police recovered three 9mm spent shell casings from the scene of the shooting. Police later obtained a warrant to examine Officer Tran's service pistol. A ballistics comparison confirmed that the bullets fired at Mr. Patel were fired by the NYPD weapon which had been issued to Officer Tran.

38.    Police also examined Officer Tran's phone as part of their investigation. That examination revealed that the phone had been used to conduct internet searches for information regarding the shooting.

39.    When Officer Tran's weapon was examined by New Jersey police, it was found to have been reloaded.

40.    Officer Tran continued to report for his normal job duties as an NYPD officer between the time of the shooting and the date of his arrest on more than two weeks later.

41.    At the detention hearing held in Camden County on June 25, 2024, evidence included a psychological report that was discussed on the record. This report confirmed that

Officer Tran had long-term alcoholism and job-related PTSD. Those are conditions which should have resulted in his never having been hired as an NYPD officer and never being issued a deadly weapon. He had been advised by superiors who knew of these problems to get help, but that never happened.

42.     The detention hearing also included admissions by Officer Tran's criminal attorney that Tran had no recollection of the event as a result of excessive drinking.

43.     The City of New York and the NYPD are responsible for this tragic incident. Although Officer Tran pulled the trigger, longstanding policies, procedures and practices of the City and the NYPD proximately caused the injuries to Kishan Patrel.

44.     For at least two decades there has been an accepted alcohol culture in the NYPD and a failure, constituting deliberate indifference, to adopt and/or enforce adequate policies, procedures and practices to address a longstanding problem of alcohol and substance abuse by police officers, both on-duty and off-duty.

45.     The City's and NYPD's deliberate indifference to adequately respond to alcohol and substance abuse by its police officers includes a failure to adopt and/or enforce policies addressing the use and misuse of police issued service weapons by police officers, both on-duty and off-duty, who are not fit for duty because of said abuse while in possession of their firearms.

46.     The City and NYPD knew, or should have known, that there were serious deficiencies in the operation of the NYPD, including without limitation the provision of hiring, training, supervision, and discipline provided to Defendant Officer Tran by Defendants Police Officer John Does 1-10.

47.     The City and NYPD knew, or should have known, that there was a failure in the hiring, training, supervision, and discipline was negligent with respect to allowing a ticking

timebomb to join the force, to be a known alcoholic, suffering from traumatic stress disorder and to be allowed to remain on the force and armed with his service issued weapon.

48.     This incident of an armed and dangerous New York City police officer shooting at innocent civilians highlights an open secret within the police force- the NYPD has a longstanding alcohol and substance abuse problem, and the City has been deliberately indifferent to effectively addressing it.

49.     The City's longstanding deliberate indifference is demonstrated by the failure to take necessary steps to deal with the problem despite Commissioner Bratton vowing in 1995, during his first tenure as New York City Police Commissioner, to address it with a "new strategy on police corruption".

50.     Also in 1995, former Mayor Rudolph Guiliani created the Commission to Combat Police Corruption ("Commission") which produced a report in 1998 reviewing cases of on-duty and off-duty misconduct fueled by the misuse of alcohol. The Commission then made recommendations to address the problem, but the City and NYPD never took the necessary steps to effectively implement them.

51.     The fact that Officer Tran was known to have a long-standing problem with alcohol and other mental health issues, and that the only action taken by his superiors was to put him in the office of DCPI without disarming him, shows the nature and extent of NYPD's failure to deal with this problem.

52.     NYPD did nothing to prevent Officer Tran from taking his NYPD issued weapon and using it to commit acts of violence and mayhem.

53.     Officer Tran's misconduct was not an isolated incident as evidenced by the number of other incidents involving NYPD officers who should not have been on the force.

54.    There are numerous other examples of alcohol abuse by NYPD officers, and the harms that result. Examples include, but are not limited to:

a.    On October 6, 2013, drunken off-duty NYPD Police Officer Joseph McClean was arrested and charged after hitting a pedestrian in Staten Island. The pedestrian was killed and the officer was charged with manslaughter.

b.    In August 2013, veteran NYPD Police Officer Ronald Holmes was charged with drunken driving related offenses after driving the wrong way on the Southern State Parkway, in Long Island, New York.

c.    In March 2013, Joseph King, a 28-year-old NYPD Police Officer, was charged with DWI, Leaving the Scene of an Accident, and Refusal to Take Breath Test. Police say King had gotten into an accident on the BQE in Queens around 4:30 a.m. on Sunday. After allegedly fleeing the scene and then being pulled over, he refused to take a breath test.

d.    On March 17, 2013, at 6 a.m., NYPD Police Officer Dennis Munge, 32, was charged with DWI in Jackson Heights, Queens.

e.    On March 18, 2013, at 1:30 a.m., NYPD Detective Washington Mosquera, 37, was charged with DWI in Brooklyn.

f.    On November 16, 2012, NYPD Police Officer Miguel Ocasio, 30, was pulled over and was arrested after he refused to take a breath test, authorities said. Police charged him with resisting arrest, driving while intoxicated and refusal to take a breath test.

g. Also on November 16, 2012, NYPD Police Officer Ismile Althaibani, 29, was pulled over at about 3 a.m. and ultimately charged with driving under the influence.

h. In July 2012, NYPD Police Officer Elvis Garcia, 27, who had been on the job for just a year, was driving his personal vehicle about 5:45 a.m. when he was involved in a two-car crash. He was subsequently charged with driving while intoxicated.

i. In July 2012, NYPD Police Officer Salisha Alirasul, 34, was arrested for DWI.

j. In July 2012, NYPD Police Officer Brayan Terrazas, 26, was arrested for DWI.

k. On February 27, 2012, NYPD Police Officer Christopher Morris, 31, was driving a marked squad car when he lost control and smacked into a light pole in East New York about 4 a.m. He was charged with driving while intoxicated.

l. In December 2011, NYPD Police Officer Rafael Casiano, 44, was driving on a Bronx expressway at about 4:30 a.m. Friday when his car smashed into a center divider. The passenger was another off-duty NYPD Police Officer, Keith Paul, who suffered a head wound and had to be hospitalized. They were coming home from their Manhattan precinct Christmas Party.

m. In December 2011, NYPD Police Officer Kleaburgh Carvajal was charged with DWI.

n. In March 2011, NYPD Police Officer Sergio Gonzalez drove under the influence of alcohol or drugs and crashed into the rear of an NYPD patrol car before finally being handcuffed.

o.  In October 2009, NYPD Detective Kevin Spellman was sentenced to three to nine years in prison for the drunk-driving death of a Bronx grandmother.

p.  In 2009, off-duty NYPD Police Officer Andrew Kelly struck a girl with his car in Brooklyn. Kelly pleaded guilty to driving drunk, served 90 days in jail and went to rehabilitation.

q.  In 2001, an off-duty NYPD Police Officer who spent up to 12 hours drinking before going to his Brooklyn precinct struck and killed a 24-year-old pregnant woman, her 4-year-old son, and her 16-year-old sister. Medical staff delivered the woman's baby boy, who died 13 hours later, and NYPD Police Officer Joseph Gray was eventually convicted of four counts of second-degree manslaughter. He was sentenced to 5 to 15 years in prison. The event "mushroomed into scandal" when it was discovered that other officers were drinking with Gray in a topless bar at a nearby precinct parking lot before the incident.

r.  On May 18-20, 1995, NYPD Police Officers, staying at the Hyatt Regency Hotel in Washington, D.C., disrobed, poured beer down the lobby escalator and then slid down it. Some sprayed fire extinguishers at each other and at other guests, set off false alarms and vandalized the hotel. Other reports involve armed officers in uniform drinking heavily and firearms being discharged from a hotel. Officers also allegedly tried to gain entry to women's rooms by posing as Federal agents and harassed female guests.

55.    Defendant City, as a matter of policy and practice, has with deliberate indifference, failed to adequately discipline, train, monitor, treat or otherwise direct police

officers, including the Defendant police officers, with regard to the retention of police officers like Hieu Tran who were known to be dangerous.

56.    Defendant City has also failed to adequately create and/or enforce policies and procedures that address the NYPD employees' substance abuse, including alcohol consumption, and its causal relationship to the misuse of firearms by on-duty and off-duty police officers. This deliberate indifference was a proximate cause of Defendant Officer Tran's actions on May 17, 2024.

57.    Defendant New York City, as a matter of policy and practice, has with deliberate indifference, failed to properly investigate the background, beliefs and attitudes of prospective police officers in order to ensure it hires only police officers that respect and honor the constitutional rights of individuals, thereby causing the NYPD, including its Defendants in this case, to engage in the unlawful conduct described above.

58.    Defendant New York City, as a matter of policy and practice, has with deliberate indifference, failed to properly screen police applicants for a history of, or propensity for, substance abuse, including alcohol.

## DAMAGES

59.    The unlawful, intentional, willful, deliberately indifferent, negligent, grossly negligent and reckless acts and omissions of the Defendants herein caused Mr. Patel to suffer catastrophic and permanent injuries that will affect him for the remainder of his life. These injuries have already necessitated the expenditure of hundreds of thousands of dollars in just the short time since these horrific events have occurred. That number will undoubtedly balloon into

the tens of millions as Mr. Patel will forever be dependent on machines and skilled care providers for every aspect of his survival.

60.     A bullet fired by Officer Tran entered Mr. Patel's skull just behind his right ear. That bullet caused the following:

      a.  Open fracture of right temporal bone;

      b.  Pressure ulcer of the head;

      c.  Acute blood loss;

      d.  Seizure;

      e.  Respiratory failure;

      f.  Anoxic brain injury;

      g.  Fracture of C1 vertebra;

      h.  Fracture of occipital bone

61.     As a direct result of the above incident, Mr. Patel was caused to suffer excruciating and conscious pain and suffering, including mental and psychological torment, which endure to this day and will continue for the rest of his life. He has also been caused to suffer economic damages in the form of medical expenses that will continue for the rest of his life. Mr. Patel was the manager and co-owner of his parents' successful business operation. As a direct and proximate result of this incident, Mr. Patel will now be dprived of the economic opportunities and benefits that accompany owning a successful business.

62.     Notices of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Defendant City on July 30, 2024. More than thirty days have elapsed without the matter being resolved by the City. The Notices of Claim provided detailed information regarding the actions of the City and police personnel involved in the incident underlying the

instant action and was sufficient to put the police personnel and the City on notice of the

conduct in which they are alleged to have engaged.

## **FEDERAL CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**
*42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments*

63.    Plaintiff hereby incorporates by reference all previous paragraphs as though fully

set forth herein.

64.    Defendant Hieu Tran, under color of law and with the indicia of authority of a

New York City Police Officer, violated Plaintiff Kishan Patel's due process rights to be free from

the unreasonable and unnecessary use of excessive force, unreasonable seizures, and to bodily

integrity.

65.    Defendants Police Officers John Doe 1-10, under color of law and with the indicia

of authority of New York City Police Officers, violated Plaintiff Kishan Patel's due process

rights to be free from unreasonable seizure, excessive force and to bodily integrity by

encouraging, and failing to intervene to prevent, the actions of Defendant Officer Hieu Tran

knowing that he was dangerously unsafe and in possession of his service weapon while unfit for

duty.

66.    Each of the Defendants' actions directly and proximately caused Plaintiff Kishan

Patel's injuries.

67.    By these acts, omissions and conduct, these individual Defendants have deprived

the Plaintiffs of rights secured by the Fourth and Fourteenth Amendments to the United States

Constitution, in violation of 42 U.S.C. Section 1983, for which the Defendants are individually

liable.

## SECOND CLAIM FOR RELIEF
*Monell Claims for Municipal Liability Against Defendant New York City*

68.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

69.     Defendants City, Mayor Adams and Comm. Caban, as the police department's final policymaker, are responsible for the NYPD's policy, practice and custom of being deliberately indifferent to the continued hiring and retention of Hieu Tran and other armed employees of the NYPD who are known, because of alcohol dependency and/or mental illness to be a lethal threat to themselves and those around them.

70.     Defendant City, and NYPD policymakers Defendants Mayor Adams and Comm. Caban, knew of the longstanding problem of hiring and retaining officers who had alcohol dependency and/or mental illness which rendered them unfit for duty, and despite this knowledge, left Officer Tran in possession of his service weapon.

71.     Said Defendants knew or should have known that the failure to adequately address alcohol and substance abuse within the department had caused problems in the past, and would continue to cause problems in the future, including violations of constitutional rights because of the failure to adopt and implement adequate policies, procedures and practices and to adequately screen, train, supervise and/or discipline police officers engaging in, or likely to engage in, such behavior.

72.     This deliberate indifference on the part of the City, Mayor Adams and Comm. Caban directly and proximately caused the deprivation of Plaintiff Joseph Felice's constitutional

rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §1983.

### THIRD CLAIM FOR RELIEF
*Supervisory Liability*

73.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

74.     Defendants Police Officer John Does 1-10 directly and personally participated in the events that were the proximate cause of the Plaintiff's injuries.

75.     Defendants Police Officer John Does 1-10 directly and knowingly, and with a grossly negligent derogation of their duty, encouraged and facilitated Officer Tran who was under their supervision to remain on the force and armed with his service-issued weapon despite knowledge of his alcohol dependency and other mental health impediments.

76.     Said defendants were grossly negligent when they failed to properly hire, train, supervise and discipline Officer Tran, despite knowledge that the Officer was unfit for duty and presented a danger to himself and those around him.

77.     As a direct and proximate result of Police Officer John Does 1-10 failure to supervise their subordinates, particularly Officer Tran, Plaintiffs' constitutional rights were violated as aforementioned in violation of 42 U.S.C. § 1983.

78.     As a direct and proximate result of the aforementioned actions and/or inactions of said Defendants, Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments were violated by said Defendants.

## STATE LAW CLAIMS FOR RELIEF

### FOURTH CLAIM FOR RELIEF
*Respondeat Superior Liability against Defendant New York City*

79.    Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

80.    At all times pertinent hereto, Defendants Officer Tran, Mayor Adams, Comm. Caban, Police Officers John Doe 1-10 and were acting within the scope of their employment as officers of the NYPD. Defendant City, through its agents, expressly authorized the individual Defendants Officer Tran, Mayor Adams, Comm. Caban, and Police Officers John Doe 1-10, to violate Plaintiffs constitutional rights, as described above.

81.    Defendant City knew, through its agents and through the NYPD's derogation of duty, that Defendants Tran and Police Officer John Does 1-10 had a propensity for committing such illegal acts in the line of duty, and acquiesced in the Defendants' wrongful conduct.

82.    Defendant City is thus liable under the doctrine of *respondeat superior*, for the intentional and negligent torts of Defendants Officer Tran, Mayor Adams, Comm. Caban, and Police Officers John Doe 1-10, which were committed within the scope of their employment.

### FIFTH CLAIM FOR RELIEF
*Negligence*

83.    Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

84.    Defendants Officer Tran and Police Officers John Doe 1-10, while acting as employees for New York City, owed a duty to Plaintiffs to perform their duties without violating Plaintiffs constitutional rights.

85.     Defendant Officer Tran abused alcohol both on-duty and off-duty, violated his 24 hours a day requirement to be fit for duty and possessed and used firearms while unfit for duty. These violations were proximate causes of the unlawful and unnecessary use of force against Plaintiff Kishan Patel and constitutes negligence for which the Defendants are liable.

## SIXTH CLAIM FOR RELIEF
*For Assault and Battery against Defendant Tran*

86.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

87.     The actions of Defendant Officer Tran were intentional, malicious, and were committed with wanton disregard and with depraved indifference to the Plaintiff's rights.

88.     The actions of said Defendants constituted unwarranted, unreasonable, unnecessary and excessive use of force against Plaintiff Kishan Patel who was simply an unsuspecting civilian returning home from work.

89.     The actions aforesaid constituted assault and battery against Plaintiff Kishan Patel.

90.     As a result of the conduct herein by the said Defendant, Kishan Patel suffered and continues to suffer severe physical, psychological, emotional, and economic injuries.

## PUNITIVE DAMAGES

91.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

92.     The acts of the individual Defendants were willful, wanton, malicious and

oppressive. These acts were without any justification and caused Plaintiffs severe and ongoing

suffering. Such acts therefore warrant an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

      a. Compensatory damages in an amount to be determined at trial;

      b. Punitive damages in an amount to be determined at trial;

      c. An award of the costs and expenses of this action including attorneys' fees to

the Plaintiffs pursuant to 43 U.S.C. §1988; and

      d. Any such other and further relief as this Court may deem appropriate.

## **A JURY TRIAL IS DEMANDED**

Date:   October 1, 2024                  Respectfully submitted,

                                     MARRONE LAW FIRM, LLC

                        By:   /s/Joseph M. Marrone
                                 Joseph M. Marrone, Esquire
                                 200 South Broad, Ste. 610
                                 Philadelphia, PA. 19102
                                 (215) 732-6700 – Phone
                                 (215) 732-7660 – Fax
                                 jmarrone@marronelaw.com



```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION, CRIMINAL PART
                              CAMDEN COUNTY
                              DOCKET NO. W-2024-233

STATE OF NEW JERSEY          )
                             )
         Plaintiff,          )      TRANSCRIPT
                             )         OF
     vs.                     )      MOTION FOR
                             )    PRETRIAL DETENTION
HIEU TRAN,                   )
                             )
         Defendant.          )



                    Place:  Camden County Hall of Justice
                            101 S. Fifth St.
                            Camden, New Jersey 08103-4001

                    Date:   June 25, 2024
BEFORE:

     HONORABLE MICHAEL JOYCE, J.S.C.

TRANSCRIPT ORDERED BY:

     JOSEPH MARRONE, ESQ. (Maronne Law Firm, LLC)

APPEARANCES:

     PETER GALLAGHER, ESQ.
     KEVIN MORAN, ESQ.
     (Assistant Camden County Prosecutors)
     Attorneys for the Plaintiff

     ROSS GIGLIOTTI, ESQ.
     (Gigliotti Law Group)
     Attorney for the Defendant

                    Transcriber:  Jean-Louise Zippilli
                    SUZANNE JOHNSON TRANSCRIBING
                    1417 Alpine Lane
                    Williamstown, NJ   08094
                    Phone:  (609) 970-9691
                    E-mail:
                    suzannejohnsontranscribing@gmail.com

                    Sound Recorded
                    Recording Operator: Anthony Verzilli
```

2

1                         I N D E X
2
3    PROCEEDING:                                   PAGE
4
5    Motion for Pretrial Detention                  4
6
7
8    Argument by Peter Gallagher                   4,24
9
10   Argument by Ross Gigliotti                    20,26
11
12
13
14
15
16   The Court:  Findings / Granted               27/35
17
18
19
20
21
22
23
24
25

3

1              I N D E X   T O   E X H I B I T S
2
3    NUMBER        DESCRIPTION                  ID    EVD
4
5    S-1           Complaint Warrant             4     6
6    S-2           Detective Skinner Report      5     6
7    S-3           Ballistics Report             5     6
8    S-4           Cell Site Analysis            5     6
9    S-5           Public Safety Assessment      5     6
10   S-6           Video Clip                    5     6
11   S-7           Dashboard Camera              6     6
12
13   D-1                                              21
14   D-2                                              21
15   D-3                                              21
16   D-4           Psychological Evaluation     21    21
17
18
19
20
21
22
23
24
25

Colloquy / Gallagher - Argument                    4

1      THE COURT:  All right.  Good afternoon
2  everyone.  This is <u>State of New Jersey vs. Hieu Tran</u>.
3  The Warrant is 2024-233 out of 0434.
4      Counsel, appearances.  The state first,
5  please.
6      MR. GALLAGHER:  Thank you, Judge.  Peter
7  Gallagher, appearing on behalf of the state.
8      MR. MORAN:  Assistant Prosecutor Kevin Moran,
9  on behalf of the state, as well.
10     MR. GIGLIOTTI:  Good afternoon, Judge.  Ross
11 Gigliotti, Hieu Tran.
12     THE COURT:  Thank you.
13     Good afternoon, Mr. Tran, Mr. Gigliotti, Mr.
14 Moran and Mr. Gallagher.
15     Defendant's CFA was completed on June 12,
16 2024.
17     Mr. Gallagher, Mr. Moran, you may proceed
18 with detention probable cause first, please.
19     MR. GALLAGHER:  Yes.  Thank you, Judge.
20     This is the state's application for pretrial
21 detention.  In support of that application I submitted
22 seven separate exhibits for Your Honor's consideration.
23     The first is state's Exhibit-1, which is the
24 complaint warrant charging this defendant with
25 attempted murder, second degree aggravated assault, as


Gallagher - Argument                    5

1  well as possession of a firearm for an unlawful
2  purpose.
3      State's Exhibit-2 is a summary report
4  authored by Detective Cody Skinner (phonetic), which
5  outlines the initial investigative steps undertaken in
6  this case.
7      State's Exhibit-3 is the ballistics report
8  authored by former FBI Agent Bill Shute (phonetic),
9  analyzing -- I'm sorry -- that is by the New Jersey
10 State Police doing a forensic comparison of the
11 defendant's firearm, two shell casings recovered from
12 the scene of the crime.
13     State's Exhibit-4 is the historical cell site
14 analysis placing the geographical location of the
15 defendant's cell phone during a timeline leading up to,
16 during and after the shooting in this case.
17     State's Exhibit-5 is the public safety
18 assessment generated relative to the warrant, which is
19 S-1.
20     State's Exhibit-6 is a video clip, Your
21 Honor, that I submitted to Your Honor's Chambers that
22 is taken from a business located along Route 73, which
23 depicts the -- from a distance the suspect vehicle, as
24 well as the victim's vehicle at the time of the
25 shooting.

Gallagher - Argument                          6

1           State's Exhibit-7 is a dashboard camera video
2    which was taken by one of the vehicles which was
3    collided into after the shooting.
4               In terms of probable cause, Your Honor --
5               THE COURT:  Mr. Gallagher just check --
6               Mr. Gigliotti, any objection to S-1 to S-7,
7    as identified by Mr. Gallagher for purposes of today's
8    proceeding?
9               MR. GIGLIOTTI:  No, Your Honor.
10              THE COURT:  All right.
11              S-1 to S-7 has been admitted into evidence
12   without objection and been appropriately identified by
13   Mr. Gallagher.
14              Mr. Gallagher, you may proceed to probable
15   cause.
16              MR. GALLAGHER:  Thank you, Sir.
17              For probable cause I'll rely and paraphrase
18   on State's Exhibit-1, which is the complaint warrant,
19   PC statement that is found in that warrant, as well as
20   State's Exhibit-2, which is the summary report.
21              And to paraphrase both of those, Your Honor,
22   those Exhibits indicate that on May 17, 2024, shortly
23   after 11:00 PM police officers responded to a reported
24   motor vehicle collision near the intersection of Cooper
25   Road and Route 73 in Voorhees.


Gallagher - Argument                          7

1           When they arrived the officers observed that
2    one of the vehicles involved in the collision was a
3    2023 Dodge Ram occupied by Kishan Patel.  First
4    responders arrived.  They went to render aid to Mr.
5    Patel, he was unconscious, he was unresponsive.  When
6    the first responders noted, that, although, it didn't
7    appear that Mr. Patel had struck the windshield there
8    was an inordinate amount of blood inside the vehicle.
9    And officers also note that there's apparent bullets
10   strikes on Mr. Patel's vehicle.
11              Mr. Patel was taken to Cooper Trauma for
12   treatment, and the officers were advised by staff at
13   Cooper that Mr. Patel had, in fact, sustained a gunshot
14   wound behind his right ear.
15              Now as part of the investigation into the
16   shooting crime scene detectives processed the area near
17   where Mr. Patel's vehicle had collided with the other
18   cars.  And upon investigation Detectives found three
19   nine millimeter shell casings in the roadway.  And that
20   roadway being Route 73.
21              Detectives also retrieved video surveillance
22   footage from a number of different locations.  And in
23   reviewing that footage from near the intersection of
24   the roads I mentioned earlier, Cooper Road/Route 73,
25   Detectives observed Mr. Patel's vehicle traveling

Gallagher - Argument                    8

1   northbound, it approached that intersection, stopped
2   for a red light, and the Detectives further observed a
3   white vehicle approach the intersection head in the
4   same direction, that being northbound, and that white
5   vehicle also stopped for the red light.
6          Mr. Patel moved his car forward a little bit
7   to position his car next to the white vehicle and
8   within a matter of moments, Your Honor, as Your Honor
9   can see, by review of the video footage depicted in
10  State's Exhibit-6, within a matter of moments Mr.
11  Patel's vehicle accelerated right through the red
12  light, collided with traffic in the southbound lane
13  which was also stopped for the red light.  The white
14  car which had been directly next to the victim's
15  vehicle also drove through the red light, although, not
16  at the wild rate of speed as the victim's vehicle and
17  continued driving on Route 73.
18         And I would note, Judge, that the shell
19  casings that I mentioned the Detectives found,
20  specifically, the three nine millimeter are shell
21  casings consistent with ejected from a semi-automatic
22  firearm, they were found in the roadway near where
23  these two vehicles had parked.  In other words, the
24  white suspect vehicle and the victim's vehicle.
25         Utilizing camera systems maintained by the

Gallagher - Argument                    9

1   Department of Transportation, as well as other
2   commercial entities, Detectives were able to track the
3   white car, so to speak, by following footage from
4   various cameras and they watched the white car travel
5   along Route 73 where it stopped at a Wawa gas station.
6   And the driver purchased gasoline using a credit card.
7   And based on this transaction, Judge, Detectives were
8   able to identify the credit card holder who had
9   initiated that transaction who bought the gasoline from
10  that Wawa, and that was known to be this defendant, Mr.
11  Hieu Tran.
12         Detectives also determined that the suspect
13  vehicle, the white vehicle I mentioned earlier, matched
14  this defendant's registered vehicle, which is a white
15  Lexus.  And they also learned that the defendant is
16  employed by the New York Police Department.  And
17  Detectives determined that the ammunition which was
18  found at the scene of the crime, the three spent shell
19  casings, were consistent with the ammunitions utilized
20  by the New York Police Department in their duty
21  weapons.
22         During the course of the investigation
23  Detectives also obtained call detail records from this
24  defendant's cell phone provider.  And analyzing those
25  records Detectives learned that on the night of shooing

1  the defendant's phone tracked along the path of the
2  white suspect vehicle.  And Detectives also determined
3  that the defendant's vehicle -- and once they were
4  aware of the license plate associated with his
5  registered vehicle, the Lexus, Detectives determined
6  that that vehicle had been picked up, so to speak, by a
7  license plate reader, an establishment in South Jersey,
8  earlier on the night of the shooting.
9          Detectives got video from that establishment
10 and that showed the defendant in the hours before the
11 shooting arriving at a wedding by himself and leaving,
12 again, by himself shortly before the shooting.
13         They also gained footage from other cameras
14 which are the defendant's -- the path of the vehicle
15 prior to the shooting.  In other words, after the
16 defendant left the wedding but before he encountered
17 Mr. Patel on Route 73.  And analyzing those cameras,
18 Judge, and reviewing that footage, that showed that
19 this defendant was traveling down Route 73, leaving
20 from the wedding to head back home at the same
21 approximate time that the victim, Mr. Patel, had left
22 work, and he was on -- also on his way driving home.
23         And, based on that review, Judge the
24 Detectives were able to determine that the victim and
25 the defendant had likely been stopped at several

1  intersections along Route 73 prior to that intersection
2  at Cooper and 73 where the shooting took place.
3          Now that they are armed with this information
4  Detectives obtained search warrants to seize the
5  defendant's cell phone, as well as his department
6  issued firearm so they compare to the shell casings
7  recovered at the crime scene.
8          Detectives went to New York on June 6th and
9  in addition to executing those warrants, they also
10 retrieved video footage from the defendant's apartment
11 building.
12         And that showed, Judge, that when the
13 defendant returned after the shooting -- in other
14 words, after the wedding, after the shooting -- that --
15 in the early morning hours after midnight the defendant
16 returned home and he was alone.  In other words, it
17 confirmed that the defendant was the sole occupant of
18 the vehicle before, during and after the shooting.
19         Detectives also went to the police department
20 where the defendant was at work.  The defendant's phone
21 and firearm were seized.  They were driven to the State
22 Police Laboratory.  Or the firearm, rather, was driven
23 to the State Police Lab in Hamilton.  The Lab tested
24 the firearm in the evening hours compared it to the
25 shell casing -- the three shell casings which were

Gallagher - Argument                    12

1    recovered from the roadway, and the ballistics examiner
2    determined that it was, in fact, the defendant's duty
3    issued firearm which had, in fact, fired those shell
4    casings on Route 73 in South Jersey.
5            As a result of the investigation, Your Honor,
6    the defendant is charged with three crimes.  One is for
7    second degree aggravated assault, as I mentioned.
8    Because after the defendant shot Mr. Patel, Mr. Patel's
9    car, as I said, in apparent loss of control of the
10   vehicle, accelerated rapidly through the intersection,
11   as can be seen on the dash camera.  The victim's
12   vehicle crashed into vehicles which were opposite
13   Cooper Road headed southbound on Route 73.
14           One of the occupants of those vehicles named
15   in the complaint, she was also taken to Cooper Hospital
16   for serious life threatening injuries that she
17   sustained in the crash that caused by the -- indirectly
18   by the shooting.
19           The other second degree counts were
20   possession of a weapon, in this case, defendant's duty
21   weapon, for an unlawful purpose, that being to use it
22   against Mr. Patel.
23           Obviously, Judge, the primary count, the
24   first degree count is first degree attempted murder.
25   Defendant fired, at least, three shots at the victim in

Gallagher - Argument                    13

1    this case on May 17th.  One of those bullets entered
2    Mr. Patel's craniocervical junction, which is,
3    essentially, the area where the brain meets the spine.
4    Since then -- since May 17th Mr. Patel has not regained
5    consciousness.  As of today he is still on life
6    support.  A tracheotomy was performed to allow a tube
7    to be attached to a ventilator to breathe for him.  A
8    feeding tube was attached to provide nourishment.
9    Doctors have noted that he is, at this point,
10   quadriplegic.  And they noted that the only movement he
11   has made since entered the hospital has been to flutter
12   his eyelids in response to pain.
13           And, with that, Judge, I submit as to
14   probable cause.
15           THE COURT:  Thank you, Mr. Gallagher.
16           Mr. Gigliotti, as to probable cause.
17           MR. GIGLIOTTI:  Judge, I'm going to submit
18   for purposes of this hearing to probable cause.
19           THE COURT:  The Court finds state has
20   established probable cause as a well grounded suspicion
21   a crime has been committed and the eligible defendant
22   committed the charged offense.  Defendant is charged
23   with first degree murder -- first degree criminal
24   intent, a person engaged in conduct and this is --
25   murder in the second degree possession of weapon for an

1    unlawful purpose, second degree aggravated assault.
2           The state has satisfied probable cause based
3    on S-1 -- principally, S-1 and S-2 in this matter.
4           Mr. Gallagher, you may proceed as to
5    detention.
6           MR. GALLAGHER:  Thank you, Judge.
7           In regard to the state's argument for
8    detention, I submit to Your Honor that the defendant
9    represents with a flight risk, as well as a great risk
10   of danger to the community.  And these factors are
11   present to such an extent that pretrial detention, I
12   would submit, is required under these circumstances.
13          And I would note, at the outset, Judge, that
14   one of the factors that the Court is to consider in
15   determining whether or not the state has met its burden
16   for detention, one of the factors is the strength of
17   the case against the defendant.  And I would note, in
18   this case, that the strength of the evidence against
19   this defendant is extraordinarily strong.  And I say
20   that word without hyperbole.  I believe that there is
21   an unusually large amount of evidence establishing this
22   defendant's guilt of the crimes charged.
23          You have been shown that the gunshots came
24   from the defendant's car.  They were, in fact, fired
25   from the defendant's duty issued weapon.  And,

1    furthermore, that the defendant was the only person in
2    that car at the time of the shooting.  The only
3    possible conclusion that can be drawn from this
4    evidence, Your Honor, is that it was this defendant's
5    finger on the trigger and this defendant is the one who
6    put Kishan Patel in his current situation.
7           In regard to flight risk, Your Honor, as the
8    Court can see from the two videos -- those being
9    State's Exhibit-6 and 7 -- after the defendant shot
10   into Mr. Patel's car the videos are clear, Judge, that
11   the defendant's first thought was for himself getting
12   out of there.  And even though as a result of this
13   defendant being a police officer he would've had some
14   training as a first responder, he did not even stop to
15   try to help the people he injured.  Instead, he drove
16   through a red light and got gas and drove home.
17          In looking at the reports, Judge, and
18   specifically State's Exhibit-4, which is the cell site
19   analysis, we know from the Wawa transaction that the
20   defendant filled up his gas tank about 11:18 PM.
21   Filled up his car with gas then drove straight back to
22   where he lived in Yonkers.  And looking at the cell
23   site analysis, Your Honor, as well as the video
24   recovered from the defendant's apartment building, it's
25   clear that the defendant got back home at about 12:39

Gallagher - Argument                                    16

1    AM.  That is about a 100 mile trip which the -- meant
2    that the defendant was -- at least 75 miles an hour the
3    whole way home.
4              So while the paramedics and responding
5    officers were taking Mr. Patel and the other victim to
6    the trauma center here in Camden at Cooper Hospital
7    this defendant was speeding up the Turnpike and headed
8    out of state.
9              I would submit, Judge, that the best
10   predictor of future behavior is past behavior.  Given
11   this past behavior, given the fact that the defendant
12   sped away from the scene of the crime to get back to
13   his home state of New York, I submit, that he poses
14   about a -- as clear a risk of flight as a criminal
15   defendant can pose based upon his past behavior.
16             In regards to dangerousness, Your Honor, I
17   submit that he represents, as I said at the outset, a
18   grave risk of danger in the community.
19             Now I would acknowledge in looking at the
20   PSA, he has not had adverse contacts with the criminal
21   justice system.  And I know that he has submitted
22   letters, essential character references from people who
23   have known him, worked with him, who speak to his
24   character.  I would submit, Judge, that whatever this
25   defendant did before May 17th, on that day he showed

Gallagher - Argument                                    17

1    that he is willing to take his duty weapon, which he is
2    only supposed to use as use to protect his fellow
3    citizens, and, instead, he used it to gun down an
4    unarmed man that was, simply, trying to get home from
5    work.
6              And chillingly, Judge, a man -- this victim,
7    Kishan Patel -- by all appearances this defendant had
8    never even met before the crime -- before this
9    occurred.  This victim just had the misfortune to be
10   driving down the same road as the defendant while the
11   defendant was driving home armed.
12             I note the apparent randomness of this crime,
13   Your Honor, to highlight the danger that this
14   individual poses to the community.  Cause this was not
15   a case of where Your Honor will sometimes see there is
16   a, sort of, landing standing dispute between the victim
17   and defendant that ends in violence.  This appears to,
18   simply, have been a chance encounter.  So, I submit,
19   that the category of persons who would be placed in
20   danger by this defendant's release into the community
21   would, essentially, be anybody he happened to
22   encounter.
23             I would also note, Your Honor, that the next
24   morning after shooting Mr. Patel at close range and,
25   essentially, leaving him for dead and driving away, the

Gallagher - Argument                          18

1   defendant reported for work like nothing had happened.
2   The only real acknowledgment he made at what he had
3   done was he refilled his magazine for his firearm to
4   replace the rounds that he had fired on Mr. Patel.
5   Because when the Detectives wend to New York and seized
6   his firearm for testing they noted that it was, once
7   again, fully loaded.
8            I mention that, Judge, because the defense
9   submitted some materials that suggest that the
10  defendant presents himself as someone who, essentially,
11  was in a stressful situation, blacked out at the time
12  and has no memory of the events of the night.
13  Obviously, I don't believe that this presents him as
14  less of a risk to the community if that is the case.
15  But I submit to the Court that that's not the case.
16  That this defendant knows exactly what he did.
17           THE COURT:  If I can interrupt you, Mr.
18  Gallagher?
19           MR. GALLAGHER:  Yes, Sir.
20           THE COURT:  Speaking of assertion of lack of
21  a memory.
22           MR. GALLAGHER:  Yes, Sir.
23           THE COURT:  You seized defendant's phone?
24           MR. GALLAGHER:  Yes, Sir.
25           THE COURT:  Did an extraction of that phone?


Gallagher / Gigliotti - Argument               19

1            MR. GALLAGHER:  Yes, Sir.
2            THE COURT:  And the incident occurred on May
3   17th, correct?
4            MR. GALLAGHER:  Yes, Sir.
5            THE COURT:  Your law enforcement official did
6   not go up to New York until June 6th, is that correct?
7            MR. GALLAGHER:  Yes, Sir.
8            THE COURT:  Do you recall what the defendant
9   was looking for on his phone on May 26th?
10           MR. GALLAGHER:  Yes, Sir.  Your Honor took
11  the words right out of my mouth.  I was going to
12  represent to the Court that the extraction of the
13  defendant's phone showed that on that date he was
14  reading a media account of the shooting.  So he knew --
15           THE COURT:  What would've prompted him to
16  read a media account about a shooting he wouldn't have
17  any knowledge about?
18           MR. GALLAGHER:  Correct, Sir.  This took
19  place in South Jersey, the defendant is -- lives in
20  Yonkers employed by the New York City Police
21  Department, however, was reading a media account in
22  response to a search he had conducted on his phone of
23  the shooting which took place.
24           I bring Your Honor's attention to that --
25  well the -- it was, apparently, already brought to the

1  Court's attention by a review of the exhibits.  I
2  highlight that, Judge, simply, because I think that
3  that undercuts all of the assertions in the
4  psychological report that presents him as, sort of,
5  psychologically damaged to the point where he's not
6  aware of what happened.
7          As I said, he refilled his magazine and he's
8  reading media accounts of it.  He knew exactly what he
9  did.
10         For those reasons, Judge -- and I would ask
11 for the opportunity for rebuttal depending on any
12 defense representations made about the psychological
13 assessment -- but for those reasons, I submit to the
14 Court that this defendant presents a clear flight risk,
15 he presents a clear risk of danger to the community
16 give -- especially, given the seemingly randomness of
17 this horrible, horrible action.
18         And I would ask the Court that he remain
19 detained in the Camden County Jail pending trial on
20 these charges.
21         THE COURT:  Thank you, Mr. Gallagher.
22         Mr. Gigliotti.
23         MR. GIGLIOTTI:  Judge, clearly, this is a
24 unique case.  The crime is serious.  It's as serious as
25 it gets.  And in the spirit of intellectual honesty,

1  Judge, I'll concede that the state has a strong case.
2  But everything else bout this case, Judge, screams
3  aberration.  The case is a complete aberration because
4  we're dealing with a 27 year old New York Police
5  Officer with no criminal history, whatsoever, no
6  domestic violence history and a score of one/one on the
7  PSA.  Additionally, Judge, in Exhibits one through
8  three, which are character letters from co-workers,
9  he's described as being kind, compassionate and this
10 out of character.
11         So, in other words, we're not dealing with a
12 rouge cop.  We're not dealing with a man with a
13 criminal inclination.  We're not dealing with a man
14 with a history of aggression.  Otherwise, I don't see
15 how fellow police officers would state their
16 reputations on endorsing Officer Tran's character.
17         So what are we dealing with.  Judge, Exhibit-
18 4 is an exhaustive psychological evaluation performed
19 by Dr. --
20         THE COURT:  Mr. Gigliotti, let me stop you
21 one second.
22         Mr. Gallagher, any objection to D-1, D-2, D-
23 3, D-4 for limited purpose for today's proceeding as
24 way of proffer?
25         MR. GALLAGHER:  No, Judge.

Gigliotti - Argument                                    22

1          THE COURT:  Moved into evidence without
2   objection.
3          You may proceed, Mr. Gigliotti.
4          MR. GIGLIOTTI:  Judge, Exhibit-4 is an
5   exhaustive psychological evaluation performed by Dr.
6   Wiltzy (phonetic), dated June 23rd.
7          Now what we have here, according to Dr.
8   Wiltzy, is a young police officer suffering from
9   untreated work related PTSD, depressive disorder and a
10  long history of substance abuse, specifically, Judge,
11  he's been self medicating with alcohol for years.  Dr.
12  Wiltz offers the opinion that these conditions were a
13  direct contributing factor to this unfortunate event.
14  Dr. Wiltzy also --
15         THE COURT:  His commanding officer in New
16  York PD told him to get treatment for it and didn't do
17  it.
18         MR. GIGLIOTTI:  Excuse me?
19         THE COURT:  His commanding officer, New York
20  PD recognized he had an alcoholic abuse problem, told
21  him to get treatment for it, hasn't done it.
22         MR. GIGLIOTTI:  And he didn't.  Understood.
23  That's right.
24         THE COURT:  Right.
25         MR. GIGLIOTTI:  That's right.


Gigliotti - Argument                                    23

1          Dr. Wiltzy further indicates, Judge, that he
2   believes Officer Tran was on a downward spiral.
3          Now, accordingly, Judge, in line with Dr.
4   Wiltzy's recommendations, what are we asking for.
5   We're asking for the Court to consider release pending
6   trial on level three plus monitoring with very specific
7   conditions.  Number one, that he be released from jail
8   directly into an inpatient dual diagnosis treatment
9   facility, Judge.  Now, of course, a dual diagnosis
10  treatment facility is designed to treat, both,
11  psychiatric and substance abuse issues.
12         Secondly, Dr. Wiltzy says that he recommends,
13  after inpatient, that Officer Tran undergo intensive
14  outpatient treatment and individual psychological
15  treatment.
16         These conditions, Judge, I submit, would
17  ensure that he's no danger to the community.  Indeed,
18  he'll no longer be exposed to work related stress and
19  he'll be receiving proper treatment, both, on an
20  inpatient and outpatient basis.
21         Lastly, Judge, as far as it relates to him
22  being a flight risk.  He has no criminal history.  He
23  scores a one on the FTA risk scale.  And he has fellow
24  officers endorsing his good character, Judge.  He's got
25  strong family support, including a sister who will open

Gigliotti / Gallagher - Argument                24

1   up her home in New Jersey for him to live there for
2   monitoring purposes.
3              So, Judge, with these conditions, I would
4   submit that defense has demonstrated that there are
5   release conditions that would ensure that he poses no
6   risk to the community and that would ensure his
7   appearance in court proceedings.
8              THE COURT:  Mr. Gallagher, if you'd like to
9   respond you may proceed.
10             MR. GALLAGHER:  Thank you, Judge.  Just
11  briefly.
12             Defense counsel noted that the treating -- or
13  evaluating psychologist, rather, Dr. Wiltzy, indicate
14  that he's on a downward spiral.  That's located on page
15  nine of the report.  Going down the following sentence
16  the doctor goes on the opine that, "It seems inevitable
17  that something tragic was impending in his life based
18  upon his physical, psychological and emotional
19  deterioration."
20             So if I read this correctly, the doctor's
21  essentially opining that his was almost inevitable that
22  this defendant was going to do something awful.
23  Nothing about this report says that it was limited to a
24  one time thing, as I read it, Your Honor.
25             So I agree with that part of it.  It seems

Gallagher - Argument                25

1   that he was a power keg or a time bomb waiting to go
2   off.  The unfortunate reality is that there is no
3   guarantee that this was a one time event.  And that's
4   what the state's entire argument is premised upon.
5              The other thing I would note, Judge, is that
6   Dr. Wiltzy is not saying -- again, if I'm reading the
7   report correctly -- he's not saying that the defendant
8   should be released into the community.  He says that he
9   should be released into an inpatient facility.  And,
10  essentially, the opinion is that he will receive
11  treatment such that the behavior, the wildly out of
12  control behavior he exhibited in May ruining any number
13  of lives with his actions, that a treatment plan would
14  satisfy the Court that he won't do anything like that
15  again, he won't hurt anybody again, he won't try and
16  flee to New York, again.
17             I would note, Judge, that Dr. Wiltzy does not
18  even have a treatment plan.  He has some opinions about
19  what a treatment plan should look like.  He says that,
20  "Such treatment should include trauma focused therapy,"
21  and also he needs a psychiatric evaluation.
22             So, in other words, Judge, the doctor does
23  not have a treatment plan in place that could provide
24  stability to this defendant.  He's, simply, saying that
25  if he goes to an inpatient facility they'll come up

Gallagher / Gigliotti - Argument                    26

 1    with a plan for him.  And that even though there is no
 2    plan in place that's been established, even though it
 3    hasn't even been started yet, even though he has
 4    declined on previous occasions, as Your Honor noted,
 5    availing himself with such psychological services, this
 6    doctor is opining that he'll get a treatment plan and
 7    that will work and he'll follow it.
 8                I submit, Your Honor, that that (inaudible).
 9    I think that it is no disparagement of the
10    psychological sciences to say that it is a -- getting
11    out way far ahead of the evidence that this doctor has
12    to say that someone will be all right because they're
13    thinking about starting treatment.
14                So, with that, Judge, I rely on my other
15    arguments and submit that there is nothing in D-4 that
16    would -- should satisfy the Court that he represents
17    any less of a danger.  And D-1 through 3, which are the
18    character letters were written by people who were not
19    on Route 73 that night.
20                THE COURT:  Thank you.
21                Mr. Gigliotti, if you'd like to respond.
22                MR. GIGLIOTTI:  Judge, there is a treatment
23    plan in place.  And the treatment plan is release
24    directly from jail.  We're not talking about release
25    today.  We're talking about being released from jail

Gigliotti - Argument / The Court - Findings         27

 1    into a dual diagnoses treatment facility.  That is a
 2    very specific type of facility, Judge.  It's designed
 3    to address people that suffer from substance abuse
 4    issues and psychiatric issues.  And then after that
 5    it's recommended that he do intensive IOP
 6    pharmacological treatment and individualized
 7    psychiatric treatment.
 8                So to say that there's no plan in place,
 9    Judge, I think is incorrect.  There's a very specific
10    plan.  Dr. Wiltzy writes an eight page report here
11    indicating what he feels is the best treatment that
12    this officer can receive.  And that if he's in this
13    type of treatment he will not be a danger to the
14    community, Judge.
15                THE COURT:  Thank you.
16                In reaching a decision on the motion to
17    detain -- and that is where the defendant presents a
18    risk of flight, danger, non-appearance or obstruction,
19    the Court must consider a number of factors under New
20    Jersey Statute 2A.1:62-20, those are factors A though
21    F.
22                This is a tragic set of facts.  It's tragic
23    for the Patel family, Hummel family, the Tran family
24    and Mr. Tran's brothers and sisters on the New York
25    Police Department Force.

The Court - Findings                              28

1       Nevertheless, this defendant is charged with
2   first degree criminal attempt, person engaged in
3   conduct, attempted murder, second degree possession of
4   a weapon for an unlawful purpose, second degree
5   aggravated assault.
6       First degree convictions carry with it a
7   period of incarceration, the presumption of
8   incarceration 10 to 20 years.  Second degree offenses,
9   again, carry the presumption of incarceration of five
10  to ten years.
11      Particular circumstances are well documented
12  in S-2, they are summarized in the probable cause
13  statement in S-1.  On -- in that statement on May 17,
14  2024, approximately, 11:12 PM, Voorhees Police
15  Department was notified of a multi-vehicle crash in the
16  intersection of Route 73 and Cooper Road in Voorhees,
17  New Jersey.  Upon arrival, Officers locate a yellow
18  truck with ballistic strikes on it.  The driver of the
19  truck later identified as Kishan Patel was located in
20  the vehicle with an apparent gunshot wound.  Mr. Patel
21  was transported to Cooper Medical Hosp -- Medical
22  Center where he was reported as critical and unstable.
23      Officers also located three nine millimeter
24  casings at the scene.  Surveillance footage was
25  obtained from the area.  Detectives reviewed footage

The Court - Findings                              29

1   from the timeframe of the shooting.  Observed the
2   victim's truck stop at the traffic light at the
3   intersection of 73 and Cooper.
4       Detectives further observed a white SUV
5   arrived at the intersection at which point the victim
6   moved his truck in a position directly next to the
7   white SUV.  Moments later the yellow truck accelerated
8   through the red light into oncoming traffic colliding
9   with other vehicles resulting in serious injury to
10  Stephanie Hummel, who was transported to Cooper Medical
11  Center with life threatening injuries.
12      The white SUV accelerated through the red
13  light and fled the scene.  Detectives review footage
14  from additional camera systems and track the white SUV
15  to a gas station in Mt. Laurel.  The motorist purchased
16  gasoline with a credit card belonging to Hieu Tran.
17  Detectives determined that Tran owned a vehicle
18  consistent with the suspect vehicle.  A preliminary
19  review of Tran's cell phone records show that the
20  location of Tran's phone was consistent with the route
21  of the white SUV.
22      On June 6, 2024, the Detectives obtained
23  Tran's department issued firearm.  A forensic
24  comparison of that firearm with the casings recovered
25  from the scene reveal that the casings had been fired

The Court - Findings                                    30

1    from this defendant's firearm.
2            S-2 goes into greater detail.  There is the
3    site analysis from varied surveillance.  It shows this
4    defendant at a wedding facility on Williamstown Road in
5    Sicklerville.  And then the site analysis shows this
6    defendant and the sus -- the victim's vehicle traveling
7    along the Route 70, as described by Assistant
8    Prosecutor Gallagher.
9            Police obtained video footage from a Wawa
10   store.  They obtained credit card records from a
11   Discover card that was used to purchase gasoline.
12   Results came back to this defendant as the holder of
13   that Discover card with a phone number.  A search of
14   that phone number indicated that the carrier was T-
15   Mobile.  The -- the owner of the white Lexus they were
16   able to identify.  Comes back to this defendant.
17           Detectives went to New York Police Department
18   with a subpoena.  And utilizing Detectives from the
19   Internal Affairs Unit of the New York Police
20   Department.  And obtained a subpoena -- a follow up
21   subpoena from a New York State Judge.  They obtained
22   this defendant's phone and his department issued
23   sidearm.
24           They conducted an analysis of that sidearm
25   and it shows consistent with the spent shell casings

The Court - Findings                                    31

1    that were retrieved at the scene of the accident.
2            The cell phone belonging to this defendant
3    was analyzed.  Preliminary review indicated that on May
4    17th, day of the shooting, in the early morning hour --
5    evening hours, this defendant was looking for the
6    wedding site.  There are multiple entries for the
7    wedding site.  And then after defendant -- after
8    shooting was -- arrives back in New York on May 26th,
9    the web history portion of the phone extract a
10   NewJersey.com article was located of the shooting at
11   Cooper Road and Route 73.
12           Mr. Gallagher has identified the injuries
13   sustained by Mr. Patel, they are horrific.
14           The weight of the evidence, it's a very
15   strong state's case.  You have a surveillance footage,
16   you have all the physical evidence -- the gun, the cell
17   phone, cell site analysis, spent shell casings, credit
18   card information, phone records and extracts, and the
19   ballistic testing that was done.
20           History and characteristics of defendant.
21   They favor this defendant, he's 27 years of age.  From
22   the S -- D-4, which is the doctor's report, he was
23   born in Bronx, New York, graduated from Rowan
24   University, employed as a law enforcement officer in
25   New York since February of 2021.  Although, he's now

The Court - Findings                              32

1   suspended because of the impending criminal charges.
2   He has five sisters, two who live in Bayville, New
3   Jersey, and one in Toms River, both, located in Ocean
4   County, New Jersey.  Thus, the defendant does not have
5   significant ties to the Camden County or South Jersey
6   area.
7            Based upon the defense proffered submissions,
8   defendant -- it appears defendant has a significant
9   substance abuse history social with alcohol consumption
10  that he's not sought treatment to manage.
11           The criminal history, the -- this favors the
12  defendant, as well.  He has no prior DP convictions, no
13  prior indictable convictions, no violent convictions,
14  he's not been incarcerated 14 days or more, no juvenile
15  adjudications reported, no restraining orders reported,
16  he was not on pretrial monitoring at the time of this
17  offense, there are no petty charges, he is not on
18  probation, not on parole.  And there's no failure to
19  appears.
20           Defendant's public safety assessment risk
21  scale scores he has a one out of six for risk of
22  failure to appear; he has a one out of six for new
23  criminal activity.  There's a no release
24  recommendation.  That recommendation, therefore, is
25  based upon the nature of the charges.  And I'm, of

The Court - Findings                              33

1   course, mindful of the State vs. Mercedes case.
2            "The nature and seriousness of the danger to
3   any other person of the community that will be posed by
4   the eligible defendant's release."
5            This defendant is a law enforcement officer
6   who took an oath to serve and protect the community.
7   Presumably, he has been trained in the proper handling
8   and lawful use of a handgun which would include not to
9   possess a firearm while or after consuming alcoholic
10  beverages.
11           Here, as a result of some traffic or other
12  dispute defendant used his police department issued
13  firearm and fired three shots at an unarmed individual
14  who was operating a motor vehicle on a public roadway.
15           Ballistics charged from the defendant's
16  police weapon struck that motor vehicle and the
17  motorist.  As a result of being struck by a bullet
18  discharged by the defendant the victim was unable to
19  safely control his vehicle causing it to strike two
20  other vehicles who were in the opposite lanes of
21  travel, Route 73 south.
22           A motorist in a vehicle struck by the
23  victim's vehicle suffered significant bodily injuries.
24  Defendant's behavior demonstrates a significant and
25  gross deviation from the normal norms of society and

The Court - Findings                              34

1  clearly places the community at great risk.
2          I've also considered the state's argument on
3  the flight risk and I concur with the state.  This
4  defendant does not have significant ties to the
5  community.  He left the scene of this motor vehicle
6  accident driving through a red light.  He drove 100
7  miles to his apartment in New York City; went to work
8  the next day; reloaded his duty weapon because it was
9  missing three bullets.  Days later he searched
10 NewJersey.com regarding the South Jersey shooting.
11         Clearly, this defendant poses a flight risk.
12         While not raised, the Court is going to
13 address <u>State vs. Mercedes</u>, which focusing on -- solely
14 on the nature of the charge.  However, here, I've
15 considered the nature and circumstances of the criminal
16 charge and rely on the seriousness of this -- these
17 charges and give them great weight.
18         Second, I carefully reviewed the evidence.
19 The video surveillance, the credit card account
20 information, the phone records and extracts, ballistic
21 testing, and find this is a very strong and well
22 documented state's case against the defendant.  And,
23 therefore, give it great weight.
24         Lastly, I've considered the recommendations
25 of no release by pretrial services but I'm not bound by

Colloquy                                         35

1  that recommendation, nor is the decision to detain rest
2  exclusively on that recommendation.
3          In this case, I give the PSA recommendation
4  modest weight.
5          In deciding the state's motion to detain the
6  Court is mindful of the overarching principles
7  governing release decisions in establishing conditions
8  of release, it's a statutory command that the least
9  restricted conditions be employed to achieve the goals
10 of the statute.
11         Here, I'm firmly convinced based upon the
12 factual reasons previously recited, relying upon S-1
13 and S-2, that the state has met its burden by clear and
14 convincing evidence and no amount of monetary bail,
15 non-monetary conditions or a combination of monetary
16 bail and conditions would reasonably assure the
17 defendant's appearance in court when required or will
18 protect the safety of any other persons or the
19 community.
20         Therefore, I am granting the state's motion
21 to detain this defendant.
22         Defendant will be afforded a reasonable
23 opportunity for private consultation with counsel.
24 Defendant will have a right to an expedited appeal of
25 this order.  That appeal must be filed within seven

Colloquy                                                36

```
1     days of entry of the -- this order pursuant to Court
2     Rule 2:9-13B.
3              Defendant's next appearance will be a
4     preindictment conference on August 28, 2024.
5              Mr. Gigliotti, anything further?
6              MR. GIGLIOTTI:  No, Sir.
7              Mr. Gallagher, anything further?
8              MR. GALLAGHER:  No.  Thank you, Judge.
9              THE COURT:  Thank you.
10             The matter is adjourned.
11                  (Off The Record)
12
13                 *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

                                                        37

```
1                    CERTIFICATION
2
3
4     I, JEAN-LOUISE ZIPPILLI, the assigned transcriber, do
5     hereby certify the foregoing transcript of proceedings
6     dated 06/25/2024, index numbers from 01:37:10 to
7     02:13:31, is prepared to the best of my ability and in
8     full compliance with the current Transcript Format for
9     Judicial Proceedings and is a true and accurate
10    compressed transcript of the proceedings as recorded.
11
12
13     /s/ Jean-Louise Zippilli          07/22/2024
14        Jean-Louise Zippilli           Date
15
16
17     /s/ Suzanne T. Johnson            AD/T 734
18        SUZANNE T. JOHNSON             AOC Number
19
20     Suzanne Johnson Transcribing      07/22/2024
21         Agency Name                   Date
22
23
24
25
```